MICHAEL J. BETTINGER (SBN 122196)
SHANE BRUN (SBN 179079)
HOLLY HOGAN (SBN 238714)
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: 415.882.8200
Facsimile: 415.882.8220
mike.bettinger@klgates.com
shane.brun@klgates.com
holly.hogan@klgates.com

Attorneys for Defendant
F5 NETWORKS, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT NETWORKS, INC., | Case No. 3:10-cv-03365-SI |
| Plaintiff, | **F5 NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR ATTORNEY FEES, AND OTHER FEES AND COSTS** |
| v. | |
| F5 NETWORKS, INC. | **Hearing Date: May 10, 2013** |
| Defendant. | **Time: 9:00 a.m.** |

**F5 NETWORKS, INC.'S MOTION FOR ATTORNEY FEES, AND OTHER FEES AND COSTS**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION. ................................................................................................. 1

II.    FACTUAL BACKGROUND. .............................................................................. 3

    A.     Implicit's Patents Claimed to Cover the Dynamic Identification of a Non-
        Predefined Sequence of Components, Not of the Selection of a Path. ........................ 3

    B.     F5 Attempted, Unsuccessfully, to Engage Implicit on the Predefined Nature of F5
        Products. ..................................................................................................................... 4

        1.     F5 Tried to "Head Off" This Suit by Providing Implicit with Early
             Information on the Operation of Its Products. ..................................................... 4

        2.     Implicit's Infringement Contentions Showed that It Had No Case Against
             F5. .................................................................................................................... 5

        3.     Through Claim Construction, Implicit Tried to Recapture Disclaimed
             Subject Matter and to Rewrite Its Claims. ....................................................... 6

    C.     F5 Prevailed on Summary Judgment. ....................................................................... 10

III.   LEGAL ARGUMENT. ...................................................................................... 11

    A.     The Court Has Authority to Award Fees and Costs for Frivolous Litigation. ............. 11

    B.     Implicit's Pursuit of an Objectively Baseless Claim Construction/Infringement
        Theory in Bad Faith Warrants An Exceptional Case Finding Under 35 U.S.C.
        § 285. .......................................................................................................................... 12

        1.     Implicit's Claim Construction and Infringement Theory Was Belied by the
             Intrinsic Record, and Renders this Lawsuit Objectively Baseless. .................. 13

             a.     Frivolous Claim Construction/Infringement Theories Are
                 Objectively Baseless. ...........................................................................13

             b.     Implicit's Attempt to Redefine Its Patents to Cover Predefined
                 Sequences and Processing Paths Was Objectively Baseless. ...............14

        2.     Implicit's Claim Construction/Infringement Theory Was in Bad Faith. ......... 16

    C.     Implicit's Bad Faith Approach to Settlement Also Warrants an Exceptional Case
        Finding. ...................................................................................................................... 18

    D.     F5 Is Also Entitled to Its Expert Fees and Costs. ...................................................... 19

    E.     F5's Request Is Reasonable, and Should Be Awarded. ............................................. 19

IV.    CONCLUSION. ................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
 23 F.3d 374 (Fed. Cir. 1994)....................................................................... 12, 19

*Dominant Semiconductors Sdn. Bhd. v. OSRAM Gmb H*,
 524 F.3d 1254 (Fed. Cir. 2008)........................................................................ 2

*Eon-Net LP v. Flagstar Bancorp*,
 653 F.3d 1314 (Fed. Cir. 2011)............................................ 12, 13, 14, 16, 18, 19

*Highmark, Inc. v. Allcare Health Management Systems, Inc.*,
 687 F.3d 1300 (Fed. Cir. 2012)............................... 2, 12, 13, 17, 18, 19

*MarcTec, LLC v. Johnson & Johnson*,
 664 F.3d 907 (Fed. Cir. 2012)........................... 13, 14, 16, 17, 18, 19

*Mathis v. Spears*,
 857 F.2d 749 (Fed. Cir. 1988).................................................................... 20

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
 549 F.3d 1381 (Fed. Cir. 2008)................................................................ 12, 20

## FEDERAL STATUTES

35 U.S.C. § 285 ................................................................................ 1, 11, 12, 21

## NOTICE

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that on May 10, 2013 at 9:00 a.m., or as soon thereafter as the parties may be heard, in the courtroom of the Honorable Susan Illston, located at the San Francisco Courthouse, Courtroom 10, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant F5 Networks, Inc. will and hereby does move for an award of attorney fees and expert fees and costs against Plaintiff Implicit Networks, Inc. ("Implicit") pursuant to Federal Rule of Civil Procedure 54 and Rule 54 of the Northern District of California Local Rules.  This Motion is made on the grounds that, as discussed in more detail below, Implicit pursued frivolous litigation and that attorney fees and expert fees and costs are warranted under 35 U.S.C. § 285, as well as the Court's inherent authority.  This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, the pleadings in the record, the Declaration of Shane Brun, the Declaration of Jeffrey Christianson, and any other argument or evidence that may be presented in advance of or at any hearing of this Motion.  This motion is made following the meet and confer of counsel, which occurred on March 26, 2013.

## ISSUE TO BE DECIDED

Whether Implicit's pursuit of a frivolous lawsuit against F5 warrants an award of attorney fees and expert fees and costs under 35 U.S.C. § 285 and the Court's inherent authority?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION.

In multiple cases in recent years, the Federal Circuit has taken frivolous patent litigation seriously.  The message is clear: patentees who pursue litigation based on meritless claim construction/infringement theories are subject to fee awards under 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").  Indeed, Chief Judge Radar has spoken publicly about the exigency for fee awards in unfounded cases:

When the case is over and the court can identify [a party seeking to enforce a patent far beyond its actual value or contribution to the prior art], I strongly advocate full-scale reversal of attorney fees and costs! Of course, the bar can help here by making a motion…Keep in mind that the Federal Circuit reviews a finding of an exceptional case for clear error and the award of attorney's fees for a very infrequent abuse of discretion. Just one further word: this improvement suggestion is not really discarding the American rule that each party pays its own attorney. Instead this fee reversal recommendation is a tool to discourage cases that are brought only to obtain revenue from litigation avoidance instincts. In that sense, this recommendation is part of the responsibility of the bench and bar to protect the integrity of the US judicial structure

Chief Judge Randall J. Radar, "The State of Patent Litigation," E.D. Texas Judicial Conference (available at *http://www.patentlyo.com/files/raderstateofpatentlit.pdf*).  Exceptional cases are (i) objectively baseless cases brought in bad faith such that no reasonable litigant could reasonably expect success on the merits and (ii) those characterized by litigation misconduct.  *Highmark, Inc. v. Allcare Health Management Systems, Inc.*, 687 F.3d 1300, 1308-130 (Fed. Cir. 2012); *Dominant Semiconductors Sdn. Bhd. v. OSRAM Gmb H*, 524 F.3d 1254, 126(Fed. Cir. 2008).  Implicit's case against F5 is, unfortunately, one that compels a fee award.[1]

Less than a month after filing suit, ***Implicit acknowledged that if F5's products operated in the manner F5 represented, F5 would not infringe the patents-in-suit***.  *Brun Decl.*, ¶13 and Ex. C. Implicit eventually recognized that F5's representation was correct; indeed, the parties did not dispute "the basic design and configuration of the BIG-IP products."  *Document No. 173* (MSJ Order) at 25:20-21; *see also id.* at 27, fn. 31 (based on undisputed facts, F5's "BIG-IP . . .  functions in a way that is contrary to the purpose of Implicit's inventions").  But rather than dismiss this case, Implicit continued litigating with a frivolous claim construction/infringement theory – a theory that Implicit forced F5 to defend, and the Court to reject, twice.  *Id.* at 25:23-26:2 ("Because the parties' arguments hinge on claim construction – and largely reiterate arguments made during Claim

---

[1] To avoid burdening the Court any further with this case, F5 also offered to bring this motion for attorneys' fees before the Honorable Eugene Lynch (ret.) at J.A.M.S. in a binding mediation. Implicit refused. *Brun Decl.*, ¶3.  F5 remains willing to proceed before Judge Lynch, or a magistrate, if the Court would prefer to make a referral on this motion.

Construction – they lend themselves to resolution on summary judgment"). Implicit used the claim construction process to try and recapture what it expressly gave up to obtain its patents (namely, selection of pre-identified sequences of components), and also to redefine its claims to apply to actual processing paths. Implicit's read of its patents was plainly contradicted by the intrinsic record. Unsurprisingly, the Court rejected Implicit's constructions aimed at ballooning its patents to cover pre-defined sequences and actual processing paths, and confirmed that Implicit's patents applied to the dynamic identification and selection of individual components used to process a message after a packet had been received. *See, e.g., id* at 27:1-4 ("This conclusion is consistent with Implicit's repeated characterization of its invention as one which was different from prior art because Implicit's patents identify the individual components needed to process the message (the sequence) dynamically and post-first packet"). Implicit nevertheless persisted, rehashing the same rejected theory. The Court's summary judgment (again) confirmed what Implicit has known from the outset of this case: its patents do not cover the selection of pre-identified sequences of components or processing paths, and thus, F5 did not infringe.

In the interim, Implicit dragged F5 through two and a half years of expensive patent litigation based on nothing more than frivolous claim construction positions. To make matters worse, it also refused to negotiate settlement in good faith, rejecting F5's offers to settle the case for *the same cost of defense amounts as F5's competitors*. Implicit instead demanded an amount higher by a multiple of fifty, insisting that its case against F5 was destined for nothing short of trial. It took two and a half years of litigation, and over $2.7 million dollars from F5, to prove what Implicit already knew about its patents. The fees were real dollars to F5, with real and measurable harm to F5's business. *See Declaration of Jeffrey Christianson* ("*Christianson Decl.*"), ¶¶ 3-4. F5 is now entitled to recover at least those fees from Implicit.

II.     **FACTUAL BACKGROUND.**

A.     **Implicit's Patents Claimed to Cover the Dynamic Identification of a Non-Predefined Sequence of Components, Not of the Selection of a Path.**

As the Court's claim construction and summary judgment orders confirmed, Implicit's patents cover the dynamic identification of each component of a non-predefined sequence "on-the-fly" <u>after</u>

1   the data is received by the system.  Implicit was forced to disclaim simply selecting a sequence of

2   components already identified before data was received (*i.e.*, a path) in order to overcome Mosberger.

3   In Implicit's words, "*identifying*" <u>after</u>, not <u>before</u>, receiving data was the key:

> This is the difference between a dynamic system (the '163 invention)
> and a static, inflexible system (Mosberger) that merely selects – at
> run-time – previously created paths. . . . **Mosberger's selection of**
> **pre-configured paths after receiving a packet is not covered by**
> **the claims <u>because, by definition, Mosberger has already</u>**
> **<u>identified</u> the sequence of components at that point, and**
> **therefore, does not perform <u>the claimed "identifying"</u> <u>after</u>**
> **receiving the packet**.

9   *Brun Decl.*, Ex. B. (emphasis added).

**B.     <u>F5 Attempted, Unsuccessfully, to Engage Implicit on the Predefined Nature of F5</u>**
    **<u>Products.</u>**

     1.     <u>F5 Tried to "Head Off" This Suit by Providing Implicit with Early Information</u>
        <u>on the Operation of Its Products.</u>

14           F5 made extraordinary efforts from the outset of this case to impress upon Implicit that F5

15   products did not dynamically identify a non-predefined sequence of components post-first packet.

16   Towards that end, F5's General Counsel and a Senior Technical Architect traveled to San Francisco

17   to meet with Implicit's counsel soon after this case was filed.  *See Brun Decl.*, Ex. C and ¶13.  F5

18   explained the relevant operations of its systems in detail in that August 2010 meeting, and,

19   importantly, Implicit's counsel *acknowledged that F5's systems would not infringe if they worked*

20   *as described*.  *Id.*, ¶13 and Ex. C.  Encouraged, F5 invited Implicit to F5 to see first hand how the

21   accused products work.  *Id*, ¶13 and Ex. C. Implicit declined.  *Id.*, ¶13 and Ex. C.  Instead, Implicit

22   requested early discovery of technical documents to confirm that F5's products worked as described

23   at the San Francisco meeting.  *Id.*, ¶13 and Ex. C.  After F5 provided those documents, Implicit

24   responded by accusing F5 of "misdescribing" its products.  *Id.*, Ex. D.  F5 nevertheless remained

25   cooperative and agreed to produce a technical witness for an early Rule 30(b)(6) deposition on the

26   accused products, in February, 2011.  *Id.*, ¶15.  As expected, that deposition provided further

27   evidence that F5 does not infringe Implicit's patents – evidence that Implicit also chose to ignore.

28   *See Document No. 166* (Storer MSJ Decl.) at 13:16-14:19, 15:17-18:12,  19:7-28, 25:12-15, 26:13-

30:2, 30:21-31:5, 33:15-20, 36:20-37:24, 68:20-21, 76:14-15, 77:9-10, 78:10-22, 81:23, 82:22 (citing

February, 2011 deposition testimony of Saxon Amdahl).  It was clear at that point that Implicit was

not interested in the merits of its case.

2.    <u>Implicit's Infringement Contentions Showed that It Had No Case Against F5.</u>

Implicit's subsequent infringement contentions made it obvious that Implicit had no claim

against F5.  After Implicit's first contentions (dated March, 2011) F5 tried again to engage Implicit

on the merits.  F5 wrote to Implicit about the deficiencies in Implicit's contentions, including the fact

that F5 products use pre-identified paths:

> Implicit contends that F5 infringes claims directed at data conversion
> systems in which individual conversion routines are selected and
> arranged on-the-fly based on the format of the incoming data.  No such
> conversion system, or anything remotely like it, is used in F5's accused
> products.  In fact, **Implicit is still unable in its contentions to identify
> evidence even suggesting infringement despite having the benefit of
> technical documents from F5 and having taken F5's 30(b)(6)
> deposition on the accused products**….
> F5's products do not dynamically identify non-predefined sequences of
> components.  Rather, F5's TMOS platform, including iRules, is a
> purely preconfigured environment.  The TMOS platform and any
> associated iRules, will, in response to predefined events, take
> predefined actions, including the routing of data on a particular and
> *predefined* path through the network.  **<u>Selecting a predetermined and
> preconfigured path is not the same as dynamically identifying a
> non-predefined path as required by Implicit's patents</u>**. . . . As you
> have been told by both Dave Schmidt and Mr. Amdahl from F5, and as
> you have also seen in F5's documents, **<u>F5, like Mosberger, relies
> solely on preconfigured paths that are identified and configured at
> "build-time" before any data is received</u>**.

*Brun Decl.*, Ex. E (emphasis added).

Obviously realizing that F5 used predefined processing paths, Implicit simply changed its

interpretation of its patents, when it should have dismissed its case.  Implicit's newly-minted view of

its patents appeared in its May 23, 2011 amended infringement contentions.  In those contentions,

Implicit introduced a wholly revised infringement theory: that a path may be fully pre-

identified/configured, but until it is "bound together by a compiler" it is still "non-predefined" under

the patents:

> The sequences of processing components in F5's TMOS/TMM system
> **<u>are not bound together at system build-time</u>**, and instead the
> sequences are selected at run-time.  **As the code processing modules**

**F5 NETWORKS, INC.'S MOTION FOR ATTORNEYS' FEES**

1   **are not bound together pre-kernal compilation, they are not "pre-
defined**," as that term is used in Implicit's claims; the sequence is
2   "non-predefined."

3   *Brun Decl.,* Ex. F (emphasis added).

4                3.       Through Claim Construction, Implicit Tried to Recapture Disclaimed Subject

5                         Matter and to Rewrite Its Claims.

6            To get any traction on this new theory, Implicit would need to re-write its patents through

7   claim construction to try to cover the selection of pre-identified/preconfigured sequences of

8   components and the selection of processing paths.  Implicit's proposed, and subsequently rejected,

9   claim constructions tried to enforce its patent far beyond their actual scope.  On their face, Implicit's

10  constructions and its contentions were baseless; therefore, F5 wrote again to Implicit on July 13,

11  2011, highlighting the frivolous nature of Implicit's new positions, and the continuing deficiencies in

12  Implicit's contentions:

13
            **Underscoring Implicit's gross overreaching in this case, Implicit's
14          amended contentions are based on nonsensical and unsupportable
            claim interpretations and continued misrepresentations about F5's
15          products, all in the face of overwhelming contrary evidence**. . . .
            For example, Implicit still fails to cite any evidence that F5 meets at
16          least the following limitations:  (1) dynamically identifying a non-
            predefined sequence of components, (2) identifying each component in
17          the sequence based on matching input and output formats, and (3)
            processing each message based on the first packet of the message.
18          **Instead of citing evidence, Implicit offers frivolous attorney
            argument.  This is of course not surprising because, as Implicit well
19          knows, F5 performs none of these limitations.**
            <u>**There is no non-frivolous argument that "identifying a non-
20          predefined sequence of components" somehow depends on whether
            those components are "bound together pre-kernal compilation,"**</u>
21          whatever that means to Implicit, or that F5 in any way dynamically
            identifies non-predefined processing paths.  As Implicit knows from
22          F5's witnesses and documents, F5 relies solely on predefined paths that
            are identified and configured at "build-time" before any data is
23          received.

24  *Brun Decl.,* Ex. G at 1 (emphasis added).  Implicit nevertheless continued on its newfound view of

25  the patents.  That view was rejected in the Court's claim constructions, as the three key terms

26  discussed below illustrate:

27

28

| Term/Phrase | Implicit's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| "non-predefined sequence of components" | Sequence of components changeable [at] runtime. *Component*: plain meaning.  In the alternative, one or more software routines. | A sequence of conversion routines that was not identified in or determinable from configuration information in place before the first packet of a message was received. | A sequence of software routines that was not identified before the first packet of a message was received. *Document No. 93* at 6. |

Implicit's could not have reasonably expected that the Court would adopt its "changeable at runtime" construction.  *First*, it goes without saying that a system cannot merely select or change preconfigured *paths* when it must dynamically select *the individual components to form the path in the first place*.  Under Implicit's improper proposed construction, however, the patents could actually *include* a system that selects preconfigured paths, so long as the preconfigured paths are "changeable" (a phrase that appears nowhere in the intrinsic record) at runtime.  *See Document No. 63* (Defendants' Claim Construction Brief) at 7:20-10:14.  *Second*, Implicit sought to change the particular period of time in which the claimed "sequence of components" must *not* be defined.  Implicit's construction proposed pre-runtime, suggesting that "non-predefined" excludes only those sequences that are somehow defined even before the "machine is turned on," as opposed to "before the first packet of a message was received."  *See Document No. 63* (Defendants' Claim Construction Brief) at 10:15-12:8.  The Court's claim construction order squarely rejected Implicit's attempt to redefine its patents:

> Plaintiff's definition . . . attempts to introduce "changeable at runtime," words which themselves would need to be construed . . . .  The proposed words do not find support in the specification and do not appear to be necessary because the claim itself identifies the item frame during which the sequence must be non-predefined – i.e., before "the first packet was received."

*Document No.* 93 (Claim Construction Order) at 6:11-19.

| Term/Phrase | Implicit's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| "Selecting individual components" | Selecting components that are not bound together by a compiler. | Sequentially selecting the individual conversion routines of the sequence by comparing the input and output formats of the conversion routines. | Selecting the individual software routines of the sequence so that the input and output formats of the software routines are compatible. "The Court finds that, based on the claim language, teachings of the specification and the prosecution history, a necessary part of **selecting individual components** is determining the compatibility between the output of one software routine and the input of the next." *Id.* at 10-11 (emphasis added). |

Implicit likewise sought to exaggerate the scope of its patents through its proposed construction of "selecting individual components" as "selecting components that are not bound together by a compiler." Tellingly, the phrase "are not bound together by a compiler" appears *nowhere* in the intrinsic record. By injecting this fictional phrase into the claim language, Implicit hoped to annul what was necessitated by the plain language of "selecting individual components"; to wit, selecting *individual components*, not a formed sequence. *See Document No. 63* (Defendants' Claim Construction Brief) at 17:13-20:20. Implicit's proposed construction also backtracked on its repeated representations to the USPTO that the selection of individual components take place by matching the components' input and output formats. Implicit, in fact, represented during claim construction that input/output compatibility was just one of many ways to select components – the exact opposite of what it told the USPTO to obtain the patents. *See Document No. 63* (Defendants' Claim Construction Brief) at 17:13-20:20. The Court's claim construction order rejected Implicit's attempts to undo the limitations it placed on its claims in order to overcome prior art during reexamination:

> Plaintiff's proposed construction includes words – "bound" and "compiler" – that themselves would need construing…The Court also finds persuasive the repeated representations plaintiff made in the reexamination process regarding how the patent uses format information of the packets to "identify individual components"…[B]ased on the claim language, teachings of the specification, and the prosecution history, a necessary part of **selecting**

**individual components** is determining the compatability between the output of one software routing and the input of the next.

*Document No.* 93 (Claim Construction Order) at 10:9-10, 10:26-28, 11:6-10.  Given this disconnect between the intrinsic record and Implicit's proposed construction, Implicit could not have reasonably expected to read "selecting individual components" as "selecting components that are not bound together by a compiler."

| Term/Phrase | Implicit's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| "Create/form [the… sequence of components]" | Instantiate in memory. | Plain meaning. | Plain meaning. "Plaintiff's proposal for this term attempts to incorporate words which themselves would need to be construed, e.g., instantiate and memory. Plaintiff offers little support or reasoning for incorporating these additional words into the definition." *Id.* at 11. |

The "creation" or "formation" of a sequence is what is accomplished by the selection of *individual* components.  That point is not even arguable, as is evident from the plain language of the claims.  Implicit nevertheless manufactured a way to do so.  Implicit's "instantiation in memory" construction for this term  – again – sought to squeeze in a limitation bereft of any intrinsic support in order to erase individual component selection as a meaningful limitation of the claim scope.  *See Document No. 63* (Defendants' Claim Construction Brief) at 20:21-21:17.  The Court's claim construction order again rejected Implicit's attempts to circumvent the intrinsic record: Plaintiff's proposal for this term attempts to incorporate words which themselves would need to be construed, *e.g.*, instantiate and memory.  Plaintiff offers little support or reasoning for incorporating these additional words into the definition."  *Document No.* 93 (Claim Construction Order) at 11:20-22.  It goes without saying that, given the intrinsic record, Implicit could not have reasonably expected to prevail on its "instantiation in memory" theory.

With Implicit's claim constructions rejected, along with its attempt to cover pre-identified/preconfigured sequences and paths, F5 wrote to Implicit again and demanded that Implicit drop its case against F5:

1

2

3

4

5

Implicit's claims against F5 depended entirely on baseless constructions trying to cover the selection of previously identified paths upon receipt of a packet.  The Court resoundingly rejected those constructions.  **Under the Court's constructions of "non-predefined sequence of components," "dynamically identifying," and "selecting individual components," there is no argument whatsoever that F5 infringes Implicit's patents**.  As such, please confirm by Monday, March 5, that Implicit will be dismissing its claims against F5.

6

7

*Brun Decl.*, Ex. H (emphasis added).  Implicit's response was flip:  "F5 lost the claims hearing…Your client infringes squarely and we look forward to trying the case."  *Id.*, Ex. I.

8

### C.    F5 Prevailed on Summary Judgment.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

In view of Implicit's obstinance, F5 moved for summary judgment.  Importantly, Implicit's opposition did not dispute the operation of F5's accused products.  *See Document No. 173* (MSJ Order) at 25:20-21 ("Implicit and its expert Dr. Scott Nettles do not dispute [the][] basic design and configuration of the BIG-IP products").  The parties' arguments instead "hinge[d] on claim construction – and largely reiterate arguments made during Claim Construction – [and] lend themselves to resolution on summary judgment."  *Document No.* 173 (MSJ Order) at 25:20-21.  Implicit's opposition was a proverbial broken record.  Trying to keep its case alive, Implicit simply rehashed the claim construction arguments already rejected by the Court, and otherwise tried to rewrite the Court's constructions, and the claims themselves.   *First*, Implicit tried – again – to redefine its claims to apply to the selection of preconfigured, actual processing paths.  The Court's summary judgment order reiterated that "identification and selection of the individual components to form the processing sequences is what is required by the claim language." *Document No.* 173 (MSJ Order) at 26:22-24.  The order also expressly rejected Implicit's expanded view of its patents:  "[t]he claims do not require the dynamic selection of a physical processing path, they require the dynamic selection of the full sequence of processing components.  There is no support for Implicit's attempt to redefine the claims." *Document No. 173* (MSJ Order) at 28, fn. 32.

25

26

27

28

Moreover, it was *undisputed* that F5's accused products used pre-configured sequences of components.  *Document No. 173* (MSJ Order) at 27:12-14 ("It is not disputed that the Hudchains which set out the processing routines to be applied to every authorized type of message/flow are defined and loaded into the system's memory prior to the arrival of the first packet").  Implicit tried

1  to envelop F5's products in its patents by positing that it did not disclaim all pre-configured

2  processing information; but, as the Court recognized "Implicit *did* disclaim the use of a pre-

3  configured sequences of components, as represented in the BIG-IP products as the

4  Hudchain…Therefore, [F5's accused products] cannot read on this significant limitation."

5       *Second*, Implicit also made another run at its "instantiation in memory" requirement, trying to

6  spin gold from nothing.  The Court rejected this (already rejected) read of Implicit's patents:

7  
8        Apparently, this is why Implicit proposed construing "create" as used in "wherein dynamically identifying included selecting individual components to create the non-predefined sequence of components after the first packet is received to mean 'instantiate in memory." **The Court rejected Implicit's attempt and adopted the plain meaning of create.**

9  
10  

11  *Document No. 173* (MSJ Order) at 26, fn. 29 (emphasis added).

12       *Third*, Implicit tried to maneuver its way out of the compatability check requirement of its

13  claims by arguing that the limitation could be met by pre-first packet activities.  The Court

14  recognized, however, that

15        like the "selecting of individual components" step of which it is a part, the compatibility step has to be done *post-first packet*.  Implicit points to no evidence that there is any type of compatibility check in the BIG-IP, other than in the Hudfilter constraints step run before the Hudchains are put in place and run well before the instantiation of the Connflow.

16  
17  

18  *Document No. 173* (MSJ Order) at 29:7-10 (emphasis in original); *see also id. at* 29, fn. 34 ("The

19  amended claim language and Implicit's statements in the Reexam therefore require *some* dynamic-

20  identification of *individual* components, ensuring the packets are compatible, post arrival of the first

21  packet.  Implicit has not pointed to any feature in the BIG-IP products that does this.")

22       In short, the Court's summary judgment order rejected Implicit's efforts to change the scope

23  of its patents, and confirmed what Implicit knew all along:  F5 did not infringe the patents-in-suit.

24  **III.**    **LEGAL ARGUMENT.**

25      **A.**    **The Court Has Authority to Award Fees and Costs for Frivolous Litigation.**

26       Patentees that pursue frivolous litigation – like Implicit has here – are subject to an award of

27  attorney fees under 35 U.S.C. § 285.  The statute gives a court authority to award fees when the (i)

28  prevailing party proved by clear and convincing evidence that the case is "exceptional," and (ii) an

award of fees is appropriate.  *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323-1324 (Fed. Cir. 2011).  Attorney fees may be imposed under 35 U.S.C. § 285 in two circumstances.  *First*, fees are appropriate when the suit is in bad faith, and the litigation is objectively baseless.  *Highmark, Inc. v. Allcare Health Management Systems, Inc*., 687 F.3d 1300, 1308-1309 (Fed. Cir. 2012).  "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits."  *Dominant Semiconductors Sdn. Bhd. v. OSRAM Gmb H*, 524 F.3d 1254, 1260 (Fed.Cir.2008) (internal quotation marks omitted).  *Second*, fees are likewise warranted when the patentee engaged in litigation misconduct, including lodging frivolous filings and engaging in vexatious or unjustified litigation.  *Highmark*, 687 F.3d at 1308-1309; *see also Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc*., 549 F.3d 1381, 1387-88 (Fed. Cir. 2008).

Moreover, although section 285 does not expressly contemplate an award of expert fees, such fees are warranted under the Court's inherent power where a party abuses the judicial process. *Amsted Indus. Inc. v. Buckeye Steel Castings Co*., 23 F.3d 374, 378-379 (Fed. Cir. 1994).

As discussed below, Implicit's pursuit of a frivolous suit here warrants and award of attorney fees, and expert fees and expenses.

**B.      Implicit's Pursuit of an Objectively Baseless Claim Construction/Infringement Theory in Bad Faith Warrants An Exceptional Case Finding Under 35 U.S.C. § 285.**

Implicit's suit was objectively baseless and in bad faith, thus warranting an exceptional case finding under 35 U.S.C. § 285.  *See Highmark,* 687 at 1308-1309 (objectively baseless cases pursued in bad faith are exceptional cases under § 285).  Implicit premised this lawsuit on a frivolous claim construction theory untethered from its alleged invention.  Federal Circuit precedent is unequivocal that such a strategy is objectively baseless, and in bad faith.  Indeed, under Federal Circuit precedent, this is a textbook exceptional case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1. <u>Implicit's Claim Construction and Infringement Theory Was Belied by the Intrinsic Record, and Renders this Lawsuit Objectively Baseless.</u>

   a. *Frivolous Claim Construction/Infringement Theories Are Objectively Baseless.*

Implicit filed this lawsuit based on a frivolous claim construction and infringement theory directly at odds with both the plain language and the very purpose of its alleged invention and claims, and then remained glued to that theory even after it was rejected in the Court's *Markman* order.  The Federal Circuit has made clear that litigation rooted in a claim construction/infringement theory belied by the intrinsic record is objectively baseless.  In *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012), for example, the Federal Circuit deemed a case exceptional because the patentee's claim construction/infringement theory sought to re-capture what it expressly gave up to overcome prior art.  The patentee disclaimed stents during prosecution; thus, it "could not turn around" and accuse stent products.  *Id.*  The prosecution history and specification "clearly refuted" the patentee's proposed claim constructions in furtherance of its infringement position, rendering the case "objectively baseless."  *Id.*  Moreover, the patentee's "decision to continue the litigation after claim construction further support[ed] the district court's finding that this is an exceptional case."  *Id.*

Similarly, in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011), the patentee's unsupportable read of the scope of the patent made it exceptional.  The intrinsic record repeatedly defined the invention as one that processed information originating from hard copy documents.  *Id.*  The patentee nevertheless accused products that process information originating from soft copies (e.g., a website).  *Id.*  Given that the intrinsic record "clearly refut[ed]" the patentee's claim construction/infringement theory, the patentee's suit was objectively baseless.  *Id. see also Highmark, Inc. v. Allcare Health Management Systems, Inc.*, 687 F.3d 1300, 1311-1312 (Fed. Cir. 2012) (finding lawsuit objectively baseless when patentee's infringement theory hinged on a claim construction position that a preamble was not a limitation when the preamble plainly was a limitation).

1

        b.      *Implicit's Attempt to Redefine Its Patents to Cover Predefined*

2

        *Sequences and Processing Paths Was Objectively Baseless.*

3

     *MarcTec* and *Eon-Net* apply with equal force, here.  Implicit sought to redefine its patents as

4

something they are not through a claim construction/infringement theory at odds with the alleged

5

invention clearly described in the claims, specification, and prosecution history.  The most egregious

6

examples are discussed in turn.  *First*, Implicit sought to re-write its patent to cover what it expressly

7

and unequivocally relinquished to overcome prior art; to wit, the selection of a pre-identified/

8

preconfigured sequence of components, or path.  *See* Section II(B)(3) *infra; see also Document No.*

9

*173* (MSJ Order) at 28, fn. 32.  As the Court rightly found, however, Implicit expressly "disclaim[ed]

10

[the] use of preconfigured sequences of routines, in other words preconfigured paths." *Document No.*

11

*93* (Claim Construction Order) at 6:5-6.  In view of Implicit's eschewal of path selection, the Court's

12

claim constructions rejected Implicit's efforts to recapture it (*see* Section II(B)(3), *infra*).

13

     Undeterred, Implicit persisted with an infringement theory based on the selection of ***paths***.

14

Implicit roundly ignored that the claims' plain language requires "selecting ***individual components*** to

15

create the non-predefined sequence of components after the first packet is received."  Implicit instead

16

endeavored to recapture the selection of paths, as discussed in detail in F5's motion for summary

17

judgment.  *Document No. 165* (F5 MSJ) at 2:19-3:14, 18:26-19:6, 19 fns. 11 and 12.  Implicit's

18

motive in stretching its patents to cover paths was obvious: it was undisputed that the components in

19

F5's Hudchains are identified and selected before any traffic enters the system, and thus cannot

20

possibly meet the claim limitations.  *See id.*; *see also Document No. 173* (MSJ Order) at 27:12-15,

21

28:13-17.  The Court rejected Implicit's recasting of its patents to cover path selection on summary

22

judgment: "[t]he claims do not require the dynamic selection of a physical processing path, they

23

require the dynamic selection of the full sequence of processing components.  There is no support for

24

Implicit's attempt to redefine the claims." *Document No. 173* (MSJ Order) at 28, fn. 32.  Implicit's

25

effort to redefine its patents to cover what it expressly disclaimed renders this lawsuit objectively

26

baseless.

27

     *Second,* the frivolous nature of this lawsuit is also evident in Implicit's maneuvers to try to

28

add a requirement that the sequence of components must not only be identified and selected, but also

1  instantiated in memory as an actual, "stateful" processing path.  To inject this ersatz limitation,

2  Implicit proposed construing "create" as "instantiate in memory."  *See Document No. 93* (Claim

3  Construction Order) at 11:13-18.  The Court rejected Implicit's attempt to redefine "create":

4  "Plaintiff's proposal for this term attempts to incorporate words which themselves would need to be

5  construed, *e.g.* instantiate and memory.  Plaintiff offers little support or reasoning for incorporating

6  these additional words into the definition."  *Document No. 93* (Claim Construction Order) at 11:20-

7  24.  The Court instead adopted Defendants' proposed construction, giving the term its plain meaning.

8  *Id.*

9        Implicit nevertheless bulled ahead on the same – already rejected – reading of the patents.

10  Implicit attempted to sneak "instantiation" into another element, *i.e.* non-predefined sequence of

11  components.  The Court construed this element as "a sequence of software routines that was not

12  identified before the first packet of a message was received."  *Document No.* 93 at 20-21.  There is no

13  dispute that F5's Hudchain components are already identified before the first packet is received; to

14  circumvent this undisputed fact, Implicit ignored the Court's construction and argued that what the

15  Court really meant was a "stateful data processing path proper."  *See Document No. 165* (F5 MSJ) at

16  2:8-18, 16:19-18:4.  By twisting the Court's construction, Implicit set its sights on applying its claims

17  to pre-identified paths – which Implicit expressly disclaimed, and which is directly contrary to the

18  Court's construction.  *See id.*  The Court (again) rejected Implicit's attempt to add an "instantiation"

19  requirement on summary judgment.  In doing so, the Court noted that

20        Apparently, this is why Implicit proposed construing "create" as used
          in "wherein dynamically identifying included selecting individual
21        components to create the non-predefined sequence of components after
          the first packet is received to mean 'instantiate in memory."  The Court
22        rejected Implicit's attempt and adopted the plain meaning of create.

23  *Document No. 173* (MSJ Order) at 26, fn. 29.  Implicit's continued insistence that its patents required

24  "instantiation" in spite of the Court's claim construction order, and in spite of its "repeated

25  characterization of its invention as one [that] identify[ies] the individual components needed to

26  process the message (the sequence) dynamically and post-first packet" (*Docket No*. 93 at 27:1:4), is

27  nothing short of objectively baseless.

28

Implicit initiated this case on a baseless claim construction/infringement theory directly at odds with the intrinsic record, and hung onto that theory even after the Court rejected it on claim construction.  The intrinsic record incontrovertibly establishes that the patents reached identification of a non-predefined sequence of components post-first packet – *not* identification plus instantiation in memory, and *not* identification of a path.  No reasonable litigant could have expected to prevail on Implicit's claim construction/infringement theory.  A claim construction/infringement theory at odds with the intrinsic record, like Implicit's theory here, is objectively baseless and merits an exceptional case finding.  *See MarcTec*, 664 F.3d at 919 (claim construction/infringement theory that sought to recapture what patentee expressly disclaimed to overcome prior art is objectively baseless); *Eon-Net LP*, 653 F.3d at 1326 (claim construction/infringement theory negated by the written description of the invention was objectively baseless).

2.   Implicit's Claim Construction/Infringement Theory Was in Bad Faith.

Implicit's continued pursuit of a claim construction/infringement theory out of line with its invention also satisfies the bad faith prong of the exceptional case inquiry.   In *MarcTec*, the patentee's unsupported claim construction position evinced that it "knew its allegations were baseless but pursued them anyway."  *MarcTec*, 664 F.3d at 917-918.  The *MarcTec* patentee amended its claims to require heat; yet, even after discovery showed that the accused products did not use heat, the patentee continued its case "by relying on mischaracterizations of the claim construction adopted by this Court and expert testimony that did not meet the requirements for scientific reliability or relevance."  *Id.*  In determining that the *MarcTec* patentee "knew that it had no basis for asserting infringement and therefore pursued this litigation in bad faith," the Federal Circuit rejected the patentee's excuse that it could not have known that the trial court would disagree with its proposed claim construction.  *Id.* at 918.  The patentee "could not claim to be ignorant" of the claim language, specification, and prosecution history (as well as the doctrine of prosecution history estoppel and claim construction principles) – all of which made clear that the claims could not cover un-heated products.  *Id*; *see also Highmark*, 687 F.3d at 1312-1313 (taking an unsupportable position on claim construction demonstrated bad faith).

1      The intrinsic record here was likewise unmistakable: the patents did not encompass path

2  selection.  Implicit nevertheless tried to elude the intrinsic record, given that there was no dispute

3  about the operation of the BIG- IP products.  *See Document No. 173* (MSJ Order) at 25:20-26:2.

4  Implicit's position on the meaning of its patents was frivolous, and reverted to the same (rejected)

5  reinvention of its patents that it tried to push through claim construction.  It could not have

6  reasonably and in good faith expected to recapture the selection of paths, given the claim language,

7  the specification, and its ***repeated disclaimer*** of path selection during re-examination.  *See*, *e.g.*,

8  *Document No. 63* (Defendants' Claim Construction Brief) at 4:22-6:24, 7:14-13:8.  The intrinsic

9  record was clear that – contrary to Implicit's position – the alleged invention covered identification of

10 components (and not paths).  *See id.*  Even after the Court's claim construction order rejected

11 Implicit's recapture attempt, Implicit remained dogged in its baseless claim construction/infringement

12 theory, attempting to re-write its claims, along with the Court's constructions, to manufacture

13 infringement.  *See Document No.* 165 (F5 MSJ) at 2:19-3:14, 18:26-9:6.

14      What is more, Implicit continued with this case even though it acknowledged at the outset that

15 if F5's products worked as F5 represented, ***F5 would not infringe.***  *See Brun Decl.*, ¶13, Ex. C.  F5

16 explained its products at an early meeting for which F5's General Counsel and a Senior Technical

17 Architect traveled to San Francisco to meet with Implicit. *Brun Decl.*, ¶13, Ex. C.  F5 even invited

18 Implicit for a reciprocal visit to F5 and see first hand how the accused products work.  *Id.*   Implicit,

19 however, rejected that invitation and kept litigating.  *Id.*  Implicit refused to turn off the spigot despite

20 F5's letters *after* Implicit's first set of infringement contentions, *after* Implicit's second set of

21 infringement contentions, *after* Implicit's proposed claim constructions, and *after* the Court's claim

22 construction order, advising Implicit that F5 simply could not infringe the claims, and putting

23 Implicit on notice that F5 would seek its attorneys fees upon prevailing on summary judgment. *Brun*

24 *Decl.,* Ex. E; Ex. F at 27 (emphasis added); Ex. G at 1, and Ex. H.  And, importantly, Implicit

25 maintained this lawsuit when it ***did not dispute how F5's products worked.***  *See Document No.* 173

26 at 25:20-26:2.  Implicit should have honored its word that the (undisputed) operation of F5's products

27 did not infringe.  Instead, Implicit kept this case alive with a frivolous claim construction position,

28 forcing F5 to incur two and a half years of legal fees.  In view of the foregoing, there can be no

1   legitimate dispute that this lawsuit was in bad faith.  *See MarcTec, LLC*, 664 F.3d at 916 (where a

2   patentee "prolongs litigation in bad faith, an exceptional finding may be warranted"); *see also*

3   *Highmark*, 687 F.3d at 1316 (a case initially brought in good faith may be continued in bad faith

4   depending on developments during discovery and otherwise).

5           **C.      Implicit's Bad Faith Approach to Settlement Also Warrants an Exceptional Case**

6                   **Finding.**

7           Further indicative of the exceptional nature of this case is Implicit's – marked – bad faith

8   approach to settlement.  A patentee's settlement tactics can show bad faith for purposes of an

9   exceptional case finding.  In *Eon-Net*, for example, the patentee's settlement approach had "an indicia

10  of extortion" because of its history of filing suit followed by a demand for a quick settlement at a

11  price lower than the cost of defense.  *Eon-Net LP*, 653 F.3d at 1326.  Though Implicit's settlement

12  tactics here were slightly different, they are no less troubling.

13          Implicit simply refused to resolve this case in good faith.  It, instead, tried to assert the patents

14  far beyond their actual value, and take advantage of litigation-avoidance instincts.  Even though F5

15  had prevailed on claim construction and plainly did not infringe Implicit's patents, in an effort to

16  avoid the expenses of expert discovery and summary judgment, F5 offered to settle for the ***same (cost***

17  ***of defense) amount*** as HP and Citrix, an F5 competitor, in related cases before this Court involving

18  the same patents.  *Brun Decl.*, ¶ 22; *see also Document No. 134* at 1:24-25.  Implicit not only refused

19  the offer, but insisted that F5 pay an amount nearly ***fifty times higher***, all the while pursuing frivolous

20  and objectively baseless claim construction and infringement positions, many of which had already

21  been rejected once by the Court at claim construction.  *Id*., Ex. J.  Notably, this amount was also

22  ***forty percent higher*** than Implicit's own expert's damages claim.  *Id*., Ex. J.  And contrary to

23  indications to the Court that a final settlement conference with a Magistrate might be productive,

24  Implicit did not waiver from its outlandish demands; indeed, it went so far as to threaten that it was

25  really entitled a "nine figure award" (***more than 100 times*** higher than its settlements with HP and

26  Citrix). *Brun Decl.*, ¶23 and Ex. J.  Implicit was plainly "swinging for the fences," without any regard

27  for the merits to this case or any intention of reasonably resolving it.

28

1  Implicit's settlement tactics are a testament of its bad faith pursuit of this litigation. *See Eon-*

2  *Net LP*, 653 F.3d at 1326 (settlement tactics can demonstrate bad faith for purposes of the

3  "exceptional case" analysis). For this reason as well, F5 is entitled to its fees.[2]

4  **D.  F5 Is Also Entitled to Its Expert Fees and Costs.**

5  Implicit's frivolous, bad faith litigation conduct also merits an award of F5's expert fees and

6  costs. A court has discretion to award expert expenses under its inherent authority when a party

7  abuses the judicial process. *Amsted*, 23 F.3d at 378-79. For example, in *MarcTec*, the Federal

8  Circuit upheld the trial court's award of expert expenses (in addition to attorney fees under section

9  285) because of the patentee's bad faith in filing a frivolous action, and pressing forward with the suit

10  when it had no basis for asserting infringement. *MarcTec*, 664 F. 3d at 921. Because the patentee's

11  bad faith increased the cost of litigation in a way that was not accounted for under section 285, the

12  prevailing defendant was entitled to its expert expenses, as well. Implicit's conduct here equally

13  warrants an award of F5's expert fees and costs. Implicit's pursuit of this lawsuit through claim

14  construction and summary judgment based on its frivolous claim construction/infringement theory

15  (and refusal to engage good faith settlement negotiations) necessitated F5 hiring experts on claim

16  construction, non-infringement, invalidity and damages. F5 should not be burdened with fees for its

17  experts' services, either.

18  **E.  F5's Request Is Reasonable, and Should Be Awarded.**

19  Based on the widely accepted American Intellectual Properly Law Association 2011 Report

20  of the Economic Survey (the "AIPLA survey"), the nationwide median litigation cost for a patent

21  infringement case with more than $25 million at risk (as was this one) was $3 million through the end

22

23

24

---

25  [2] Implicit's bad faith approach to settlement also constitutes litigation misconduct warranting an exceptional case finding; *See Highmark, Inc. v. Allcare Health Management Systems, Inc.*, 687 F.3d 1300, 1308-1309 and 1312 (Fed. Cir. 2012) (internal quotations omitted) (in addition to the objectively baseless and bad faith test, an exceptional case can also be found when the patentee engaged in litigation misconduct, which "generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings, and includes advancing frivolous arguments during the course of the litigation, or otherwise prolonging litigation in bad faith").

26

27

28

of discovery, and $5 million ($6 million for San Francisco based cases) inclusive of all costs.[3] F5's

fee request of $2,764,270.07($2,532,852.00 in attorney fees and $231,418.07 in expert expenses), are

below this range, and thus are reasonable.[4]  F5's attorney fees in defending this frivolous case include

analysis of claim construction, invalidity and non-infringement arguments, retention of experts,

taking and defending depositions, appearing before the Court, preparing and responding to discovery,

all of which are reasonable and appropriate expenses under Section 285.  *See, e.g., Mathis v. Spears*,

857 F.2d 749, 759 (Fed. Cir. 1988).   F5's expert expenses include review and critique of Implicit's

expert reports, preparing expert reports, as well as preparing and sitting for deposition.  F5 is entitled

to these expenses following the Court's claim construction order in February, 2012 given that

Implicit kept its case alive based on a theory that wholly disregarded the Court's claim construction

order, and otherwise attempted to redefine the claims.  F5 is also entitled to its fees before claim

construction because this case should never have been brought in the first place – a point that F5

made in its early meeting with Implicit, and repeated throughout this case.

The purpose of awarding attorney fees is to "reimburse a party injured when forced to

undergo an 'exceptional' case."  *Mathis*, 857 F.2d at 753.  By providing for reimbursement of

attorney fees, Section 285 prevents "gross injustice where a party has demonstrated bad faith and

misconduct during  litigation," *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc*., 549 F.3d 1381, 1388

(Fed. Cir. 2008), and to deter the "improper bringing of clearly unwarranted suits," *Mathis,* 857 F.2d

at 754, 758.  Here, F5 spent $2,532,852.00 in attorney fees, along with an additional $231,418.07 in

expert fees and costs (as well as $41,500.50 in taxable costs, and $85,198.17 in other nontaxable

costs) trying to persuade Implicit of that which Implicit already knew:  F5's preconfigured systems

could not infringe.

---

[3] A district court may properly consider such surveys. *Mathis*, 857 F.2d at 755-56.

[4] The AIPLA survey of attorney billing rates for intellectual property lawyers show hourly billing rates at a median of $585 and a third quartile of $700 for San Francisco partner level lawyers, and a median of $370 and a third quartile of $470 for San Francisco associate level lawyers.  Hourly rates for K&L Gates lawyers working on the matter range from $575 to $650 for partners and $420 to $425 for associates ($260 for Texas based associates), further confirming that F5's attorney fees are in accord with the traditional rates charged in patent infringement actions.

1    It bears noting that the $2.7 million in fees that F5 incurred in this case had a serious,

2    measurable impact on its business, in real terms.  For example, F5 decided that it could not hire an

3    additional lawyer for its in-house legal department given the ongoing legal expenses of this litigation.

4    *Christianson Decl.*, ¶3.  F5 also had to limit its resources and spending on new patent filings to

5    protect its technology at a critical point when the United States shifted from a "first to invent" to a

6    "first to file" system under the America Invents Act.  Even beyond the fees, the litigation had a

7    measurable impact on F5's business.  F5 employees outside of the legal department spent over 150

8    hours attending to this litigation in depositions, document collection, and the like – time that could

9    have been spent developing and selling F5 products.  *Christianson Decl.*, ¶4.  F5 is entitled to recover

10   its fees for defending this frivolous lawsuit.

11   **IV.    CONCLUSION.**

12   Federal Circuit precedent disfavors exactly this type of case.  Indeed, Implicit's case against

13   F5 is the sort that 35 U.S.C. § 285 and fee awards under the Court's inherent authority are designed

14   to remedy.  F5 should not shoulder the large financial burden that resulted from Implicit's obstinate

15   pursuit of a dubious claim construction/infringement theory directly contrary to the plain language of

16   the claims, the specification, and Implicit's own statements to the USPTO in order to overcome prior

17   art.  For the reasons set forth above, F5 should be awarded $2,764,270.07 in attorney fees, and expert

18   fees and costs in defending itself in this frivolous case.

19   Dated:  March 28, 2013                                      K&L GATES LLP

20

21                                                              By:___/s/ *Shane Brun*_____
                                                                MICHAEL J. BETTINGER (SBN 122196)
                                                                SHANE BRUN (SBN 179079)
22                                                              HOLLY HOGAN (SBN 238714)
                                                                K&L GATES LLP
23                                                              4 Embarcadero Center, Suite 1200
                                                                San Francisco, California 94111-5994
24                                                              Telephone: 415.882.8200
                                                                Facsimile: 415.882.8220
25                                                              mike.bettinger@klgates.com
                                                                shane.brun@klgates.com
26                                                              holly.hogan@klgates.com

27                                                              Attorneys for Defendant
                                                                F5 NETWORKS, INC.

28